UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TYRIONE ISAIAH HENRIQUES,

     Petitioner,

v.               Case No. 25-cv-10881
                HON. MARK A. GOLDSMITH

KIM CARGOR,

     Respondent.

_____/

## OPINION AND ORDER (i) DENYING PETITION FOR WRIT OF HABEAS CORPUS (ii) DENYING CERTIFICATE OF APPEALABILITY

Petitioner Tyrione Isaiah Henriques is a Michigan prisoner serving a controlling sentence of 23–60 years for his Allegan Circuit Court conviction of torture, unlawful imprisonment, two counts of third-degree criminal sexual conduct, domestic violence, and assault with a dangerous weapon. Petitioner challenges his state conviction in this petition for writ of habeas corpus filed under 28 U.S.C. § 2254. After careful examination of the pleadings and record, the Court denies the petition and denies a certificate of appealability.

### I. BACKGROUND

The Michigan Court of Appeals summarized the facts of the case:

The victim lived with defendant, his parents, siblings, and half siblings from sometime in March 2018 until on or about December 19, 2018. The victim met defendant on Facebook, and they bonded over their mutual love of music. The victim was charmed by defendant's attraction to her. Initially, their relationship was good, and the victim moved in with defendant. At trial, the victim testified that soon after she moved in with defendant, he began abusing her. According to the victim, defendant punched her while calling her degrading names, stabbed her with scissors, made her sleep on a mattress in a shed behind the house during the winter, and beat her with a belt. The victim testified that defendant also confined her to the room that they shared, made her urinate in cups, and then made her stand in a corner while he poured the urine on her. The victim further testified that defendant sprayed Raid and a hair-dye chemical on her arms; made her stand in a corner of their room for hours, sometimes days; shot her with a BB gun as she walked to the shed to

1

sleep; sometimes forced her to have sex; threatened her and her family; choked her to the point of unconsciousness; and live-streamed her performing oral sex on him. During these months, the victim lost about 60 pounds. When the victim finally left defendant's home, she returned to her mother's house in another county. After serving 20 to 30 days in jail for reasons that are not clear from the record, the victim and her mother went to the Allegan City Police and reported defendant's abuse.

## A. Pretrial

Defendant was arrested on January 14, 2019. He was arraigned the following day on eight counts: Count 1 for torture; Count 2 for unlawful imprisonment; Counts 3 and 4 for CSC-III; Counts 5 and 6 for assault with intent to do great bodily harm less than murder (AWIGBH) or assault by strangulation; Count 7 for assault with a dangerous weapon; and Count 8 for domestic violence. After a two-day preliminary examination, the district court dismissed Count 1 (torture), Count 4 (AWIGBH or assault by strangulation), and Count 7 (assault with a dangerous weapon) without prejudice. The district court bound over defendant on the remaining charges. Once in the circuit court, the prosecution moved to amend the information to reinstate the dismissed charges, and the circuit court granted the prosecution's request. The prosecution also filed notice of its intent to introduce evidence of other wrongful acts under Mich. Comp. Laws § 768.27b and Mich. R. Evid. 404(b). The other-acts evidence that the prosecution planned to admit arose from the victim's preliminary-examination testimony. The prosecution later amended its notice to include other-acts testimony from Marissa Rockett, defendant's girlfriend after the victim. The circuit court ultimately granted the prosecution's motion to admit other-acts evidence.

## B. Trial

At trial, in addition to hearing from the victim, the principal witnesses for the prosecution included Patricia Haist, the director of crisis intervention services at the YWCA in Grand Rapids, who testified as an expert in domestic violence and sexual-assault-victim dynamics. Haist testified about the multitude of ways that an abusive domestic partner exercises power and control over the victim-partner, how victims of domestic violence often respond, and the ways victims of domestic violence reveal the abuse. Regarding the latter, Haist testified that victims reveal the abuse when they are ready, and that their revelations are typically incremental. According to Haist, initial disclosures are not always full disclosures, and, if abuse occurred over a long period, victims are less likely to recall every detail and multiple incidents may run together. Haist testified that it was common for victims to minimize the violence they experienced, especially at the hands of an intimate partner whom they cared about or who they thought cared about them. Haist also testified that victims might try to protect the abuser by withholding details or lying about the assault, and that victims sometimes stayed with their abusers because it could be more dangerous to leave.

The jury also heard from Bonnie Christopher, a sexual assault nurse examiner (SANE), Allegan City Police Officer Josh Morgan, and Allegan City Police Officer Matthew Luyk. Christopher, who examined the victim at the request of the police department, testified about what the victim revealed—and did not reveal—during the examination. Officer Morgan, who was the lead investigator on the case, testified about the victim's report of defendant's abuse and about photographs that were taken of the injuries to the victim's body. Officer Luyk's testimony focused on introducing the prosecution's other-acts evidence. Officer Luyk testified that, in July 2019, he performed a welfare check on Rockett, who was in a dating relationship with defendant at the time and was staying at defendant's house. When Officer Luyk saw Rockett during the welfare check, she was wearing makeup. An hour after the welfare check, Officer Luyk was called to the sheriff's station in Allegan, where he encountered Rockett again, and by this time she had removed the makeup that she was wearing at the welfare check, and the officer could see bruising on much of her left eyelid. According to Officer Luyk, while Rockett was still at the station, defendant arrived, said that Rockett was his girlfriend and that he wanted to see her, and stated that her mother said that Rockett could leave with him. Officer Luyk told defendant that he, too, had spoken with Rockett's mother and that she did not want Rockett going with defendant. Officer Luyk testified that defendant did not respond and left the sheriff's station. The victim testified that she saw bruises on Rockett's arm and body in the same place where the victim had bruises, and also saw Rockett when she had a black eye.

Witnesses for the defense included defendant's mother, stepfather, and half-sister. The latter testified that 10 people lived in the house when the victim was there. Defendant's half-sister said that the victim was her best friend while she was there and that she talked to the victim and watched television with her every day. She also said that the victim was part of the family and would go with them to the mall, to restaurants, and to get their nails done. According to defendant's half-sister, the victim was always happy and smiling, and she never wanted to leave defendant's side. The witness described the relationship between defendant and the victim as "quite good"; they made music videos together and took pictures together, and the victim would cook and do laundry for defendant. Defendant's half-sister said that she never saw defendant hit the victim, never heard any sounds of distress coming from the room that the victim and defendant shared, and never saw the victim standing in the room for days. She also said that there never was a time when the victim looked or smelled bad, and that the victim took a shower and did her hair and makeup every day.

Defendant's stepfather testified that the victim was considered a member of the family while she lived there; she ate with the family, often went with them to the store or the mall, and slept in defendant's room. Defendant's stepfather also said that the victim was free to go about the house, and no one ever prevented her from eating food at the house. He further testified that he never saw defendant hit the victim, he never heard screams or shrills coming from their room or anywhere in the house, and he never saw defendant hit the victim with a belt or spray her with

3

Raid. He also never smelled urine when he went into defendant's room, nor did he ever smell urine emanating from the victim or see burn marks, scrapes, or bruises on her arms.

Defendant's mother testified similarly, stating that the victim became like one of her daughters. She said that she never heard screaming, beating, or anything unusual coming from defendant's room, and she never saw defendant hit or push the victim. Defendant's mother testified that she never smelled urine emanating from defendant's room or from the victim's person, she never noticed any urine stains on defendant's carpet, she never smelled Raid or saw defendant spray Raid on the victim, and she never saw any burn marks on the victim arms.

People v. Henriques, No. 359614, 2023 WL 5993973, at *1–3 (Mich. Ct. App. Sept. 14, 2023).

Based on this evidence, the Allegan County jury found Petitioner guilty of torture, two counts of third-degree criminal sexual conduct, unlawful imprisonment, assault with a dangerous weapon, and domestic violence. The jury acquitted him of assault with intent to do great bodily harm and assault by strangulation. The trial court sentenced Petitioner to a controlling term of 23–60 years for the torture conviction and lesser terms for the other offenses.

Petitioner filed a direct appeal in the Michigan Court of Appeals. His appellate counsel filed an appellate brief and a motion to remand for an evidentiary hearing that raised the following claims:

I. Mr. Henriques' right to a properly instructed jury was violated where the jury was not instructed that, to find Mr. Henriques guilty of torture, it needed to be unanimous as to whether Mr. Henriques caused great bodily injury or severe mental pain/suffering. Alternatively, trial counsel was ineffective for failing to request a unanimity instruction.

II. It was plain error to admit hearsay testimony by a sexual assault nurse examiner [SANE] who repeated the complainant's accusations, unfairly bolstering the complainant's credibility. Alternatively, trial counsel was ineffective for failing to object.

III. The circuit court improperly substituted its judgment for the district court when it reinstated charges the district court dismissed. Trial counsel was ineffective for failing to file an interlocutory appeal of the circuit's order amending the information.

4

IV. The trial court erred when it admitted evidence regarding Marissa Rockett where the evidence does not meet the requirements of Mich. Comp. Laws § 768.27b, is unfairly prejudicial, and is irrelevant.

V. The requirements in Mich. Comp. Laws § 769.34(10) that the Court of Appeals affirm any sentence within the guidelines range absent a scoring error or reliance on inaccurate information is inconsistent with the Sixth Amendment, People v. Lockridge, 498 Mich 358 (2015), the due-process right to appellate review, and the separation of powers.

VI. Mr. Henriques' sentence—a controlling minimum of 23 years—is disproportionate where he was 17 years old at the time of the alleged offense and the Court did not consider his youth at sentencing.

VII. Requiring Mr. Henriques to register pursuant to 2021 SORA ex post facto punishment and therefore unconstitutional.

VIII. Mr. Henriques' sentence requiring him to register as a sex offender for unlawful imprisonment is unconstitutional for two reasons: (1) the jury did not find that the complainant was a minor at the time of the offense and (2) SORA registry for a non-sexual offense is cruel or unusual punishment in violation of our state constitution.

App. Br. at PageID.2517–2518 (Dkt. 6-23).

The Michigan Court of Appeals partially agreed with Petitioner's first claim, finding that Petitioner was entitled to a unanimity instruction on the torture charge if one been requested, but that an evidentiary hearing was required to determine whether defense counsel's failure to request the instruction constituted ineffective assistance of counsel. Henriques, 2023 WL 5993973, at *4-6. Likewise with respect to Petitioner's second claim, the state court found that portions of the SANE nurse's testimony were objectionable on hearsay grounds, but that a hearing was necessary to determine whether counsel was ineffective for failing to object. Id. at *6–7. The state court rejected Petitioner's third claim on the merits and did not address his other claims. Id. at *8–11.

At the remand hearing, and as will be discussed in more detail below, trial counsel testified that he chose not to request a unanimity instruction or challenge the admissibility of the SANE nurse's testimony as part of a deliberate trial strategy. (Dkt. 6-22). Briefly, counsel explained that

5

his strategy was to establish that the sheer number and nature of the victim's allegations undermined her overall credibility, and they were belied by the testimony of everyone else who lived in the house. Counsel did not request a unanimity instruction because he did not want the jury to focus its attention on each individual allegation made by the victim. Counsel feared that if they did so, they might find that some individual allegations were credible and would support a conviction despite the victim's overall lack of credibility. Similarly, counsel did not object to admission of the victim's statements to the SANE nurse because he wanted to use the inconsistencies in her statements to further undermine her credibility. Id. PageID.2147–2155. The trial court accepted trial counsel's testimony and found that Petitioner did not overcome the presumption that this strategy was reasonable. Id. PageID.2176–2181.

After the hearing, the Michigan Court of Appeals affirmed Petitioner's convictions and sentence in an unpublished opinion. People v. Henriques, No. 359614, 2023 WL 7457561 (Mich. Ct. App. Nov. 9, 2023).[1]

Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court. The application raised the same claims Petitioner raised in the Michigan Court of Appeals, but it omitted Petitioner's fifth and eighth claims. Pet. Application for Lv. at PageID.2850 (Dkt. 6-24 The application for leave to appeal was denied by standard form order. People v. Henriques, 3 N.W.3d 817 (Mich. 2024) (Table).

Petitioner's habeas application raises the same claims he presented to the Michigan Supreme Court. See Pet.

---

[1] The court, however, remanded that case for the trial court to enter an order removing Petitioner from the sex offender registry with respect to his unlawful imprisonment conviction. Id. *8.

## II.   ANALYSIS

### A.  Legal Standard

28 U.S.C. § 2254(d)(1) limits a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is contrary to . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases] or if it confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent." Mitchell v. Esparza, 540 U.S. 12, 15–16 (2003) (punctuation modified).

"[T]he unreasonable application prong of the statute permits a federal habeas court to grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520 (2003).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (punctuation modified). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103 (punctuation modified).

7

## B. Unanimity Instruction

Petitioner's first claim asserts that he was entitled to a unanimity instruction on the torture charge as a matter of due process, and that his counsel was ineffective for failing to request one. Petitioner asserts that such an instruction was necessary because the prosecutor argued in the alternative during closing argument that the torture charge could be established if the jury found either that Petitioner caused great bodily harm by his physical assaults or that he caused severe mental pain by threatening to kill the victim or her family. Pet. at PageID.23.

Turning to the due process claim first, the Michigan Court of Appeals found that a unanimity instruction would have been required under state law had counsel requested it. Henriques, 2023 WL 5993973, at *4. It does not follow, however, that an instruction was constitutionally required absent a request. "[A]lthough the Supreme Court has held that jury verdicts in state criminal trials must be unanimous and not decided by majority vote, Ramos v. Louisiana, 590 U.S. 83, 109–110 (2020), there is no Supreme Court precedent requiring juror unanimity on the factual basis or theory of guilt underlying a verdict, see Schad v. Arizona, 501 U.S. 624, 631–632 (1991). Accordingly, Petitioner's claim that he was denied his constitutional right to a properly instructed jury when the trial court failed to give a unanimity instruction absent a request for one cannot be supported by clearly established Supreme Court law.

Turning to the ineffective assistance of counsel claim, after reciting the applicable constitutional standard, the Michigan Court of Appeals rejected the claim on the merits as follows:

> Turning to the specific unanimity instruction, Nunzio [defense counsel] testified that he did not request the instruction because doing so would have been inconsistent with the defense's strategy. Nunzio described the defense as a "global" defense in which defendant sought "complete exoneration" by arguing that the victim's entire testimony was unbelievable. According to Nunzio, requesting a specific unanimity instruction would have been inconsistent with this defense because it would have asked jurors to "piecemeal" the victim's testimony. Nunzio feared that, if jurors did so, they may credit some portions of the victim's testimony while still disbelieving the more "incredible" portions. Nunzio was also concerned

8

that encouraging jurors to piecemeal the victim's testimony could lead the jury to convict defendant of some of the other charges, which was inconsistent with the "complete exoneration" that defendant desired. Finally, Nunzio testified that requesting a specific unanimity instruction may have exposed defendant to an additional torture charge, if the prosecution chose to pursue one. Given the wide range of reasonable strategies that defense counsel may use to win a difficult case, we agree with the trial court that Nunzio's trial strategy in this case was reasonable. While there were risks involved with this strategy, Nunzio's testimony demonstrates that he reasonably balanced those risks with both the potential harm that requesting a specific unanimity instruction may have wrought on the defense theory and the potential additional liability that defendant may have been exposed to had Nunzio requested such an instruction. We therefore conclude that defendant has failed to establish that Nunzio's performance fell below an objective standard of reasonableness in this respect as well.

Henriques, 2023 WL 7457561, at *3.

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court established the familiar two-part test for determining whether a defendant received ineffective assistance of counsel. First, a defendant must show that counsel's performance was deficient. Id. at 687. This requires showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. Second, a defendant must establish that counsel's deficient performance prejudiced the defense. Id. This requires showing that counsel's errors were so serious that they deprived the petitioner of a fair trial or appeal. Id.

As to the first element, a defendant must identify acts that were "outside the wide range of professionally competent assistance" to prove deficient performance. Id. at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. Id. at 689. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. The defendant bears the burden of overcoming the presumption that the challenged actions were sound trial strategy. Id. at 689.

As to the second element, a defendant proves prejudice by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

9

would have been different." Id. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. Id. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." Id. at 686.

"The standards created by Strickland and 2254(d) are both highly deferential, . . . and when the two apply in tandem, review is doubly so." Harrington, 562 U.S. at 105 (punctuation modified). "When 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

The determination by the state court that Petitioner failed to demonstrate deficient performance for his counsel's decision to forgo a unanimity instruction did not involve an unreasonable application of the Strickland standard. Defense counsel explained his reasons for not requesting the instruction at the state court hearing. Counsel explained that "[t]he defense on the charges was that Mr. Henriques … was innocent of all charges. He was completely and utterly innocent of all charges. That he did not commit any of the alleged acts alleged against him by [the victim]." 9/28/23 Hr'g Tr. at PageID.2147 (Dkt. 6-22). The defense was viable, counsel believed, because "if you took [the victim's] statements in the police report and at trial as a whole her statements were completely incredible. They were not believable. They were unreliable. And so what we did was we attacked what we could with each of those unreliable portions of her testimony." Id. at PageID.2147–2148.

10

Counsel wanted to focus the jury's attention on the overall credibility of the victim's entire story, and to the extent possible, avoid the jury looking to see if any of her particular allegations were true. In counsel's view a unanimity instruction would have detracted from this strategy:

> [W]e wanted the jury to take a look globally at all of her statements and global meaning that her statements were incredible, unbelievable, not reliable….
>
> Let me give you an example. She alleged that Mr. Henriques had poured urine on her. He beat her for nine months with a belt. He made her go out to a shed and sleep and he beat her out there. He poured Raid on her or sprayed the chemical bug spray Raid on her caused her chemical burns. There was an instance I think she alleged that she - he used hair products on her causing burns. And so those - and so we wanted the jury to take a look at all of that not being believable and we had called witnesses and presented evidence to show that that evidence was not true. It was not accurate.
>
> So, so if you take a look at the global picture that - that it not being believable or credible in order to request the unanimous instruction on the GBH portion, the great bodily harm and or the mental anguish portion of the torture charge it would have - it would have required the jury to piecemeal her credibility so to speak. In other words, we'd have the jury going through a process of piecemealing does this count for a GBH incident in torture, does this act constitute a mental anguish portion in the torture. And once you start breaking it down and giving the jury the opportunity to piecemeal it would have lended more credibility to the charge because you're giving the jury a box to fill in. And by virtue of doing that you give the victim, the alleged complainant in this case, more credibility.
>
> And so the fear of giving them that piecemeal where you're going to find unanimous on this, you've got to find unanimous on that portion you're - you're giving this piecemeal instruction giving her credibility focusing and highlighting on those elements to those incidences. Once you do that you give the process to the jury and then they don't start looking globally at her entire statements, her entire what we believed to be you know incredible statements. Then you give the jury the opportunity to say hey listen, you know, she might be credible on that because Mr. Nunzio didn't really challenge that effectively, or with this portion he didn't refute it very well.
>
> And so if you're using a beyond the reasonable doubt standard with respect to that and a unanimous instruction focusing and highlighting on that I believe that it would encourage the jury not only for them to find him guilty on each and every one but it would encourage a potential likelihood of convictions on the other charged acts.

11

And so that's why we didn't, you know, request the unanimous instruction on that because it gives a piecemeal analysis to the jury that looks at it a little bit closer instead of globally. And what -- what we didn't want to do is, and as you know Counselor, when the jury is given the non-corroborative evidence instruction because he was charged with two counts of CSC third degree that instruction as you know is in sexual assault cases is ladies and gentlemen of the jury you don't need any corroborating evidence and or testimony if you believe the victim beyond a reasonable doubt with respect to the sexual assault charge.

We believed that could have been confusing when applying that or looking at the torture if we were to have asked for unanimous instruction. And what I mean by that is is that I wanted the jury to evaluate this case globally from our defense that he was completely innocent based on this wild and crazy story that she gave.

And once you start breaking that down I didn't want them evaluating her story keeping in mind that they don't need any other corroborating evidence. Okay. Now, I'm not suggesting that they would be confused with the noncorroborative jury instruction but it would have cut into the defense. I wanted them to evaluate how I was impeaching the witness's Emily's testimony with how we attacked her on those grounds. And so globally we wanted -- wanted to attack it that was instead of piecemeal with look at this look at that. I think it would have cut into the defense.

Id. at PageID.2149–2151.

The state trial court and state appellate court accepted this explanation as constituting a reasonable trial strategy. Petitioner counters that the strategy was not reasonable because "[t]he jurors were already required to 'piecemeal' the complainant's testimony to determine whether the elements of each charged offense were met. There was absolutely no benefit to declining to request a specific unanimity instruction. The jury would not know who requested the instruction or that it was different from the instructions given in any other case." Pet. at PageID.28.

Of course, as Petitioner asserts, defense counsel could not completely avoid the possibility or likelihood that the jury would discuss the victim's individual allegations separately. The point of the decision not to request a unanimity instruction, however, was to avoid an instruction that would have specifically focused the jury's attention on the individual allegations and distract it from defense counsel's attack on her overall credibility. A unanimity instruction would, in

12

counsel's view, have run counter to his strategy because despite any misgivings the jury might have had about the victims' overall credibility, it might have forced the jury to "hyper analyze everything." 9/28/23 Hr'g Tr. at PageID.2159–2160. Defense counsel testified that he had tried hundreds of cases, and in his experience, requesting a unanimity instruction would have increased the chances of a guilty verdict. Id. at PageID.2159.

Defense lawyers must choose from among countless strategic options at trial, and many such decisions are particularly difficult to make because particular tactics carry the potential to both benefit or risk harm to the defense. Richter, 562 U. S. 108.  Thus, even if there is reason to think that counsel's conduct "was far from exemplary," a court still may not grant relief if "[t]he record does not reveal" that counsel took an approach that no competent lawyer would have chosen. Burt v. Titlow, 571 U. S. 12, 23–24 (2013).

The Court cannot say that every competent lawyer would have chosen to request a unanimity instruction. Many or most competent lawyers might have done so, but as evidenced by defense counsel's testimony, there are at least reasonably debatable reasons in the record supporting the approach Petitioner's counsel chose.

"[B]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009). Given the substantial deference owed, the Court will not second-guess the determination of the Michigan Court of Appeals that counsel did not perform deficiently. See Sexton v. Beaudreaux, 585 U.S. 961, 968 (2018) (per curiam) ("deference to the state court should [be] near its apex" when it involves "a Strickland claim based on a motion that turns on general, fact-driven standards…."). Petitioner therefore fails to demonstrate entitlement to relief with respect to this claim under § 2254(d).

### C. Admission of Hearsay

Petitioner's second claim asserts that the victim's statements to the SANE nurse were admitted in violation of hearsay rules, and that his counsel was ineffective for failing to object. The Michigan Court of Appeals agreed that the statements were inadmissible under Michigan Rule of Evidence 803(4) because the statements to the nurse were not made for the purpose of medical treatment. Henriques, 2023 WL 5993973, at *6-7. The state court went on to find after the remand hearing, however, that counsel was not ineffective because it was objectively reasonable for counsel to instead use the statements to impeach the victim's credibility. Henriques, 2023 WL 7457561, at *3.

With respect to the challenge to the testimony on hearsay grounds, the claim is not cognizable. Whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction . . . [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67–68 (1991). The admissibility of evidence under Michigan's hearsay rules, therefore, is not a cognizable issue in a habeas corpus proceeding. See Byrd v. Tessmer, 82 F. App'x 147, 150 (6th Cir. 2003).

The cognizable aspect of this claim is Petitioner's assertion that his counsel was ineffective for failing to object to admission of the testimony. As indicated, the state court found that Petitioner failed to demonstrate that his counsel's decision to use the hearsay statement to impeach the victim constituted deficient performance. That decision did not involve an objectively unreasonable application of the Strickland standard because it is reasonably supported by the record.

Defense counsel explained his strategy at the evidentiary hearing as follows:

[L]ooking again at this global attack on [the victim's] story, she gave so many inconsistent statements in the SANE report that we were able to use at trial.

14

Let me give you some examples. With respect to [the victim's] statement regarding the chemical burns from the hair products and the bug spray the SANE nurse noticed no marks or chemical burns on her person. There was another incident where [victim] stated right before she went to jail, 30 days before she reported this, that she had consensual sex with the Defendant. That was very important. She also did not tell the SANE nurse that Mr. Henriques threatened to kill her. These were statements that she either made in trial or at the police department. She left out that she was beaten and told to sleep in a shed.

There were other incidences that were very beneficial to the Defense that we were able to get out through a nurse, someone that she has talked to, that was in direct contradiction to her testimony. For instance, there was another example she said that she was confined, this is what she told the nurse, that she was confined in a room for four days having to face a corner of the wall with her nose. Well at trial she said she was confined or imprisoned in the room for three days. And so we were able to use to impeach her credibility regarding the SANE nurse's statements.

She also did a physical exam. There was an allegation of anal rape. There were no marks, scars, or anything notable or remarkable in any of the physical examinations. So the Defense believed clearly that this was beneficial to attacking the credibility of [the victim] while she was on the stand. So … we were able to refute just through their witness, and remember this is the Prosecutor's nonbiased medical witness, no chemical burns, no marks.

She said she was beaten with a belt for nine months every day. I think she left that out in the SANE report. There were no belt marks on this person that was observed by the SANE nurse. So those statements clearly were beneficial to the defense. That's why we let it in because how else was I going to get a medical person to describe what she described but for the positive and impeaching statements we were able to get from the SANE nurse.

9/28/23 Hr'g Tr. at PageID.2152–2154.

The trial court accepted this testimony as accurately describing defense counsel's reason for not objecting to the hearsay. Id. at PageID.2179–2180 ("He made a decision about trial strategy in regards to the sexual assault examiner nurse…. [A]nd if [defense counsel] had come into this case unprepared, not seeming to have a strategy, I might have a different view, but that's not what happened here.").

As indicated above, counsel does not perform deficiently just because his strategic decision carries risks. Richter, 562 U.S. 108. The victim's statements to the SANE nurse were

15

incriminating, but many of them also were different from what she testified to at trial. Defense counsel also thought he could show that the victim's allegations were not credible because of a lack of corresponding physical injuries noted by the nurse. Petitioner has not shown that no competent lawyer would have chosen to allow admission of the hearsay at issue here to attack the credibility of the victim. Burt, 571 U. S. at 23–24. Giving the state court the deference owed after reviewing a fully developed post-conviction record, Petitioner fails to demonstrate entitlement to relief with respect to this claim under § 2254(d).

### D. Reinstatement of Charges

Petitioner next asserts that his counsel was ineffective for failing to file an interlocutory appeal of the state circuit court's order reinstating several charges that were dismissed by the state district court after the preliminary examination. The Michigan Court of Appeals found that counsel was not ineffective because the charges were properly reinstated and an interlocutory appeal would have been futile. Henriques, 2023 WL 5993973, *8-10.

Whether sufficient evidence is presented at a preliminary hearing to warrant trial is solely a matter of state law. Gerstein v. Pugh, 420 U.S. 103, 119 (1975). Because this Court is bound by the state court's conclusion that sufficient evidence was presented at the preliminary hearing, so too, its conclusion that an interlocutory appeal challenging that determination would have been futile is unreviewable. Davis v. Straub, 430 F.3d 281, 290–291 (6th Cir. 2005) (habeas relief unavailable for ineffective assistance of counsel when doing so would require a determination that the state court erred in applying state law); see also Dell v. Straub, 194 F. Supp. 2d 629, 649 (E.D. Mich. 2002). The claim is therefore without merit.

### E. Other Acts Evidence

Petitioner's fourth claim asserts that the trial court improperly admitted other-acts evidence. Specifically, a police officer testified at trial about an interaction he had with Melissa

Rockett, a young woman who lived with Petitioner in July of 2019. About an hour after conducting a welfare check on Rockett at Petitioner's house, she appeared at the police station with a bruise on her eye. Petitioner came to retrieve her from the police station but was turned away when he was told that Rockett's mother did not want her to go with him. Jury Trial Tr. at PageID.1524, 1532–1534 (Dkt. 6-13).  Similarly, the victim in the present case testified that when she later met Rockett, she had two black eyes and bruising on her arms. Jury Trial Tr. at PageID.1174–1177. (Dkt. 6-12).  The Michigan Court of Appeals found that this evidence was properly admitted under state evidentiary rules to show Petitioner's propensity to commit acts of domestic violence. Henriques, 2023 WL 7457561, at *3–5.

A Michigan statute governing the admissibility of prior domestic assaults provides that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan Rule of Evidence 403." Mich. Comp. Laws § 768.27b(1). Unlike prior-acts evidence admitted under Michigan Rule of Evidence Rule 404(b), evidence of prior domestic violence is admissible at trial in Michigan "to show a defendant's character or propensity to commit the same act," People v. Railer, 792 N.W.2d 776, 780 (Mich. Ct. App. 2010), "as long as the evidence satisfies the 'more probative than prejudicial' balancing test of MRE 403," People v. Cameron, 806 N.W.2d 371, 377 (Mich. Ct. App. 2011).

The admission of prior domestic assault evidence, even if it is used to establish a propensity to commit domestic assaults, does not provide a basis for granting habeas relief because there is no clearly established Supreme Court law that holds that a state violates a defendant's due process rights by admitting propensity evidence. See Bugh v. Mitchell, 329 F.3d 496, 512 (6th Cir. 2003).

Similarly, to the extent Petitioner asserts that the evidence should have been excluded under Michigan Rule of Evidence 403 as more prejudicial than probative, the argument does not raise a cognizable issue. An argument that a state court misapplied or unreasonably applied Rule 403's balancing test is not cognizable on federal habeas review because it asks the Court to evaluate the state court's application of a state evidentiary rule. See Seymour v. Walker, 224 F.3d 542, 552 (6th Cir. 2000).

As for any constitutional aspect of the claim, it is well-settled that "alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review" unless "the state's evidentiary ruling is so fundamentally unfair that it rises to the level of a due-process violation." Moreland v. Bradshaw, 699 F.3d 908, 923 (6th Cir. 2012) (punctuation modified).

The Michigan Court of Appeals reasonably explained why it was not fundamentally unfair for the evidence to be admitted:

> Nothing in the record suggests that testimony about Rockett's bruises and Officer Luyk's encounter with Rockett and defendant "stir[red] such passion as to divert the jury from rational consideration of [defendant's] guilt or innocence of the charged offenses." See Cameron, 291 Mich. App. at 611–612. Moreover, the trial court minimized any prejudicial effect the other-acts evidence may have had by providing a limiting instruction, directing the jury that, if it believed the testimony about Rockett, it could only consider it in deciding if defendant committed the crimes of which he was accused; it could not convict defendant because it thought him guilty of other bad acts. A jury is presumed to follow its instructions. People v. Abraham, 256 Mich. App. 265, 279 (2003).

Henriques, 2023 WL 7457561, at *5.

There was nothing patently unfair about the prior-acts evidence admitted in this case. See Love v. Carter, 49 F. App'x 6, 12 (6th Cir. 2002). The other-acts evidence related to an event occurring months after the events of the instant case. It involved a strikingly similar situation where another young woman living with Petitioner appeared to have been assaulted by him but was reluctant to come forward. Since evidence of other acts of domestic violence is admissible under

18

Michigan law to show a propensity to commit such acts, the challenged evidence was highly probative.

Petitioner asserts that there was no evidence presented that Petitioner was the person that caused Rockett's injuries, so the injuries on their own could not constitute evidence of prior domestic abuse by him. But Rockett appeared at Petitioner's door during the wellness check while wearing makeup that appeared to conceal her bruises, and Petitioner later arrived at the police station to collect Rockett after she made her report without the makeup. As the state court reasonably found, "[v]iewing the victim's testimony about bruises in conjunction with Officer Luyk's testimony about his welfare check of Rockett and her subsequent appearance at the sheriff's station with a black eye, the jury could have inferred that defendant was also the source of Rockett's bruises." Henriques, 2023 WL 7457561 at *5. The evidence was circumstantial, but the state court did not unreasonably find that the evidence regarding Rockett's injuries constituted evidence of other acts of domestic abuse by Petitioner.

To violate due process, an evidentiary decision must "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Seymour v. Walker, 224 F.3d 542, 552 (6th Cir. 2000) (citation omitted). Petitioner cites no authority recognizing a deeply rooted principle of justice that prohibited admission of circumstantial evidence of other acts of domestic violence to show that Petitioner had a propensity for abusing his domestic partners. The decision of the state court finding that the evidence was properly admitted therefore did not contravene any principle of clearly established Supreme Court law. Bugh, 329 F.3d at 512. The claim is without merit.

19

## F. Disproportionate Sentence

Petitioner's fifth claim asserts that his prison sentence of 23-60 years for the torture conviction violates the Eighth Amendment. The Michigan Court of Appeals rejected the claim on the merits. Henriques, 2023 WL 7457561, at *6.

The Eighth Amendment does not require strict proportionality between a crime and its punishment. Harmelin v. Michigan, 501 U.S. 957, 965 (1991). "Consequently, only an extreme disparity between crime and sentence offends the Eighth Amendment." United States v. Marks, 209 F.3d 577, 583 (6th Cir. 2000).

A sentence that falls within the maximum penalty authorized by statute "generally does not constitute cruel and unusual punishment" under the Eighth Amendment. Austin v. Jackson, 213 F.3d 298, 302 (6th Cir. 2000) (punctuation modified). Courts reviewing Eighth Amendment proportionality claims must remain highly deferential to state legislatures in determining the appropriate punishments for crimes. United States v. Layne, 324 F.3d 464, 473–474 (6th Cir. 2003). As long as the sentence remains within the statutory limits, trial courts have wide discretion in determining "the type and extent of punishment for convicted defendants." See Williams v. New York, 337 U.S. 241, 245 (1949). Successful challenges to the proportionality of a particular sentence in non-capital cases are "exceedingly rare." Rummel v. Estelle, 445 U.S. 263, 272 (1980).

Petitioner's sentence of 23–60 years of imprisonment for torture falls within the statutory limits for the offense. There is not an "extreme disparity" between a crime involving eight or nine months of confinement, sexual assault, and abuse and a lengthy term of imprisonment. Though Petitioner was seventeen years old at the time of the offense, the heightened standard announced in Miller v. Alabama, 567 U.S. 460 (2012), applies only to juveniles sentenced to life without parole, not a lengthy term of years. See Atkins v. Crowell, 945 F.3d 476, 478 (6th Cir. 2019).

20

Petitioner's Eighth Amendment claim was reasonably rejected by the state courts, and Petitioner is not entitled to relief on this claim.

## G. Retroactive Application of SORA

Finally, Petitioner's sixth claim asserts that the requirement that he comply with the 2021 amendments to Michigan's sex offender registry law violates his rights under the Ex Post Facto Clause. The claim is moot because Petitioner already prevailed on this claim as a member of the class obtaining relief in Does v. Whitmer, 751 F. Supp. 3d 761 (E.D. Mich. 2024).

Does is a class action lawsuit challenging numerous provisions of Michigan's SORA. This Court certified a primary class, defined as "people who are or will be subject to registration under Michigan's [SORA]," as well as seven subclasses, the last of which includes a post-2011 subclass, defined as "members of the primary class who committed the offense(s) requiring registration on or after July 1, 2011." Petitioner is a member of the primary class and the seventh subclass. Does, 751 F. Supp. 3d at 783.

The Court in Does found that the provisions of Michigan's 2021 SORA at issue here—those that retroactively increase reporting requirements and retroactively extend registration terms—violate the Ex Post Facto Clause. Id. at 795. Petitioner will receive the same relief as all other members of the subclass. Fed. R. Civ. P. 23(b)(2). Furthermore, Petitioner may not opt out of the class and seek separate relief in this action. See Walmart-Stores, Inc. v. Dukes, 564 U.S. 338, 360 (2011) ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.") (punctuation modified). Accordingly, Petitioner's sixth claim is denied as moot. See Ketchens v. Rewerts, 2025 WL 2941908; 2025 U.S. Dist. LEXIS 203968, *7 (E.D. Mich. Oct. 16, 2025).

21

**H. Certificate of Appealability**

Before Petitioner may appeal this decision, the Court must determine whether to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy § 2253(c)(2), Petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (citation and internal quotation marks omitted). The Court finds that reasonable jurists would not debate the resolution of any of Petitioner's claims. The Court will therefore deny a certificate of appealability.

### III.   CONCLUSION

Accordingly, the Court denies with prejudice the amended petition for a writ of habeas corpus and denies a certificate of appealability.

**SO ORDERED.**

Dated: May 29, 2026                                s/Mark A. Goldsmith
Detroit, Michigan                                  MARK A. GOLDSMITH
                                                   United States District Judge


### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 29, 2026.

                                                   s/Joseph Heacox
                                                   JOSEPH HEACOX
                                                   Case Manager